**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JEANNE KUYPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:11-CV-02196-NAB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying Jeanne Kuyper's ("Kuyper") application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Kuyper alleges disability due to residuals after total left knee replacement surgery, obesity, and arthritis of the lumbar spine and right hip. [Doc. 1.] The parties consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1).

## I.    PROCEDURAL HISTORY

On September 16, 2009, Kuyper protectively filed an application for a period of disability, seeking DIB. (Tr. 89-95.) She alleged an onset date of May 27, 2009. *Id.* The Social Security Administration ("SSA") denied Kuyper's claim on December 21, 2009 and she filed a written request for a hearing before an administrative law judge ("ALJ") on January 12, 2010. (Tr. 63-67, 70-72.) The hearing took place on September 10, 2010. (Tr. 20-49.) The ALJ issued a written decision on June 17, 2011, upholding the denial of benefits. (Tr. 10-16.) Kuyper requested review of the ALJ's decision from the Appeals Council on July 18, 2011. (Tr. 5.) On

November 17, 2011, the Appeals Council denied Kuyper's request for review. (Tr. 1-3.) The decision of the ALJ thus stands as the final decision of the Commissioner. Kuyper filed this appeal on December 19, 2011. [Doc. 1.] Kuyper filed a Brief in Support of the Complaint. [Doc. 17.] The Commissioner filed a Brief in Support of the Answer. [Doc. 21.]

## II.    DECISION OF THE ALJ

The ALJ found that Kuyper met the insured status requirements of the Social Security Act through March 31, 2012. (Tr. 12.) The ALJ also found Kuyper had not engaged in substantial gainful activity since May 27, 2009, the alleged onset date of disability. (Tr. 12.) The ALJ noted that Kuyper's severe impairments included residuals after total left knee replacement surgery, obesity, and arthritis of the lumbar spine and right hip. (Tr. 12.) The ALJ found that Kuyper did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12.) Kuyper was found to have the residual functional capacity ("RFC") to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). (Tr. 12.) Therefore, the ALJ found that Kuyper had not been under a disability as defined in the Social Security Act from May 27, 2009 through the date of the decision, June 17. 2011. (Tr. 16.)

## III.    ADMINISTRATIVE RECORD

### A.    Testimony before the ALJ

The ALJ heard testimony from Kuyper and Mr. Jeffrey F. Magrowski, a vocational expert ("VE"). (Tr. 25, 53.) Kuyper was represented by counsel. (Tr. 22.)

#### 1.    Kuyper's Testimony

Kuyper testified as follows. She was 64 years old as of the hearing date. (Tr. 25.) She is 5'4" tall and weighs approximately 200 pounds. (Tr. 25.) She completed four years of college at

Harris-Stowe State College and received a degree in elementary education in January of 1970. (Tr. 27-28.)

Kuyper was employed as a financial aid assistant at the corporate offices in 2007 where she helped review check requests from the colleges. (Tr. 28.) She also performed general clerical work. (Tr. 29.) This was a desk job where she would sit for most of the day, and she worked there for about six months. (Tr. 29.) At that time, she was not taking any medication for pain. (Tr. 55-56.) She was replaced because of her lack of experience with financial aid. (Tr. 29-30.)

Kuyper's other past jobs as a teacher, unlike the financial aid job, did not allow her to sit for most of the day. (Tr. 30.) Kuyper testified that even if she were able to obtain one of her past jobs, she would be unable to work for eight hours each day, five days each week. (Tr. 30.) She would be unable to sit or stand at a chalk board for more than a couple of minutes, and she would not be able to walk around the classroom. (Tr. 30.) Kuyper lacks any vocational or trade school training. (Tr. 31.) Kuyper has taken typing tests and applied for administrative assistant jobs, but she is unable to type at a sufficient speed to qualify for work as an administrative assistant. (Tr. 56.)

Currently, Kuyper is receiving a "short-term disability kind of pension" under a state plan. (Tr. 57.) This plan will last her only five or six years, and she is receiving $250 each month. (Tr. 58.)

Kuyper had her right knee replaced in May of 1998. (Tr. 41) The surgery went well, and after six weeks of recovery, she was able to return to work with compression stockings, a walker, and a cane. (Tr. 41.)

In 2009, Kuyper was unable to find an orthopedist because of insurance complications. (Tr. 32.) On May 4, 2010, she was first seen by an orthopedic surgeon, Dr. Schroer, who took x-rays revealing "bone-on-bone" in her left knee and wearing away of the bone. (Tr. 32-33.) Dr. Schroer informed her that the wearing away was the source of the pain. (Tr. 32.) Dr. Schroer tried an injection of cortisone to stop the pain, and it worked for approximately one and a half weeks. (Tr. 33.) Limited success with the cortisone treatments led to total left knee replacement surgery. (Tr. 33.)

Kuyper had a total left knee replacement on July 8, 2010. (Tr. 31.) Prior to having this surgery, she would have to wear a brace to hold her knee in place any time she walked. (Tr. 31.) Since the knee has been replaced, her functionality has still been very slow. (Tr. 33.) Specifically, walking is slow, and the knee will stiffen so she will have to stretch. (Tr. 33.) She also must use furniture around her to steady herself as she walks through the house. (Tr. 33.) She uses the wall and window in the bathroom to get in and out of the tub because of the pain and stiffness in her knee, which also causes pain in her back. (Tr. 33-34.) Kuyper has trouble getting in the car, as she cannot swing one leg in at a time without straining her muscles. (Tr. 34.) Sitting is not too painful, so long as Kuyper is able to sit at a 90-degree angle. (Tr. 34.) However, she must then move her knee frequently to prevent it from stiffening up and causing pain and discomfort. (Tr. 34.) Because her knees do not bend easily, she has a lot of difficulty going up and down stairs, and she must take one step at a time. (Tr. 34.)

Kuyper is divorced and living alone in her house. (Tr. 25-26.) She drives a motor vehicle and in the last six months has taken long trips lasting more than an hour, including trips out of town, driving on highways. (Tr. 26.) However, she must stop every hour or hour and a half to walk for ten to fifteen minutes because of stiffness in her back and knees. (Tr. 27.) Her

shopping is limited to a forty-five minute trip, using the shopping cart as a walker and taking breaks throughout. (Tr. 32.) Because Kuyper could not walk without pain, she began having backaches as well. (Tr. 32.) Kuyper spends five or six hours each day with her foot elevated above her heart in a recliner to relieve pressure in her leg and prevent more leg and back pain. (Tr. 35.) This effectively relieves her pain, but she is limited in what tasks she can perform while reclining. (Tr. 36.) She spends between four and six hours sitting and four hours walking each day, in ten or fifteen minute increments. (Tr. 49-50.) She will take twenty minute naps between noon and two o'clock, about four times each week. (Tr. 50.) On average Kuyper is able to spend an hour doing work around the house, including washing dishes, cooking, and showering. (Tr. 51.) Kuyper cannot stand for long periods of time before she must sit from the pain, and she must constantly shift her weight from one leg to the other so as not to cause more problems from favoring one leg. (Tr. 36.)

While she was not given a restriction by Dr. Schroer regarding how much she is able to lift, she was told to use common sense and not lift things that cause pain. (Tr. 36.) The heaviest she is able to lift is three or four pounds when carrying the laundry basket. (Tr. 36.) Kuyper does her own laundry, however she has great difficulty going up and down the stairs and will use the laundry basket as a walker to help. (Tr. 38.) While she cooks, she limits herself to preparing food with a microwave, slow cooker, or something that does not need to be watched carefully because she cannot stand long enough. (Tr. 38.) She is able to sweep, but she cannot bend down without a substantial amount of pain in her back and knees so she used a tall handled dust pan. (Tr. 38.) She cannot mow her lawn. (Tr. 53.)

Kuyper visits her daughter who lives down the road frequently, and she usually visits with her four grandchildren twice each week. (Tr. 38-39.) She also goes to church, but she

cannot kneel and she sits in the back to put her leg on the pew. (Tr. 39.) Regarding her personal care, she must carry out simple tasks, such as getting dressed and getting in and out of a shower, very slowly. (Tr. 39-40.)

Kuyper takes Hydrocodone for the pain nightly and during the day when the pain gets to be too much. (Tr. 36-37.) While the Hydrocodone does help with the pain, it also "knocks her out" so she will not be able to go anywhere or do anything on days when she takes it. (Tr. 37.) Therefore, she usually takes it at night. (Tr. 37.) Following the surgery, a physical therapist visited the home she was staying in twice each week, for approximately three weeks. (Tr. 40.) She is not currently attending any kind of physical or occupational therapy, but she was given exercises to strengthen and stretch her legs. (Tr. 40.) She last saw Dr. Schroer on August 20, 2010, and had future appointment with him on October 1, 2010. (Tr. 40.)

At the time of the hearing, it had been two months since her left knee replacement surgery, and the doctor had not yet told her when he thought she would be fully recovered. (Tr. 40, 42.) She was originally told it would take three weeks to recover, but it has taken longer and she has developed pains in her right knee. (Tr. 42.) While Kuyper is unaware of the exact cause of her right knee pain, she thinks it could be the result of adjusting to her left knee replacement and favoring her right knee more. (Tr. 42-43.) When her right knee was replaced twelve years ago in 1998, she was told it would last her between ten and fifteen years depending on her level of activity. (Tr. 43.) Dr. Schroer took an x-ray of her right knee and noted that "It's doing fine." (Tr. 43.)

Kuyper also has throbbing pain and swelling in her left foot, which she must elevate to relieve the pain. (Tr. 47.) The doctor has not indicated, but Kuyper assumes, that the pain and swelling is coming from the knee problems. (Tr. 47.) She has not had her back checked

recently, and she could not recall ever having an MRI of her back. (Tr. 48.) She had been evaluated for bulging or narrowing of the discs in her back, but the results revealed no such problems. (Tr. 48.) Kuyper continues to take medication for bone density and high blood pressure, and periodically takes Tramadol for pain. (Tr. 48.) Kuyper does not wear a brace on either knee so that she can bend them. (Tr. 52.)

Kuyper rated her pain as a four for low, and an eight for high, on a scale of one to ten. (Tr. 43.) When she feels the pain starting to escalate, she considers how active she had been and for how long to decide when to take the Hydrocodone. (Tr. 43-44.) She also takes Hydrocodone to help her sleep through the night without pain, and she is then able to sleep between six and a half and seven hours on average. (Tr. 44.) She did have more pain before the surgery than she currently has now. (Tr. 49.)

Kuyper would be physically unable to work at her former financial aid job, a sit down job, because she would have to constantly stand and walk around to loosen her leg, resulting in loss of time from actually performing her job duties. (Tr. 45.) She estimated she would lose an average of ten minutes every hour of doing constructive work. (Tr. 46.) She would also be unable to perform her duties in her most recent position as an English as a Second Language teacher because it involved a lot of walking around, using the board and standing a lot. (Tr. 45.) Were Kuyper to receive a favorable result for both of her knees in the future, she felt she still would not be able to perform better at the financial aid job because her leg would continue stiffen up. (Tr. 46-47.) She also stated she would not return to work if she received a good result with her left knee. (Tr. 56.)

### 2. Vocational Expert Jeffrey Magrowski's Testimony

The ALJ posed one hypothetical to the Vocational Expert ("VE"). In the hypothetical, the ALJ asked whether a person of Kuyper's age, education, and prior work experience who has had two knee replacements and needs to move about from sitting to standing throughout the day because of pain, and as a result might miss ten minutes for every hour of actual work, would be able to sustain any work activity. (Tr. 53-54.) The VE was not aware of any jobs that would accommodate Kuyper's restrictions, given her age. (Tr. 54.) However, the VE did note that if she needed alternating sitting and standing and could remain at the work site, she could return the sedentary skilled labor in the financial aid position. (Tr. 54-55.)

The VE was not able to state with certainty whether drowsiness or lack of alertness for forty-five minutes after taking medication would interfere with her ability to return to past work or not. (Tr. 55.) This answer depended on how severe the drowsiness would be and whether the claimant would still be able to concentrate and complete job assignments. (Tr. 55.) The VE did note, however, that administrative assistant positions, similar to Kuyper's position as a financial aid assistant, were in high demand at the present time. (Tr. 55.) Finally, the VE dismissed Kuyper's contention she was unable to type well, stating she could learn to type. (Tr. 56.)

### B. Medical Records

On October 22, 2009, Kuyper was seen by Dr. Kent Campbell, complaining of hypertension and left knee pain. (Tr. 196.) She was unable to see an orthopedic surgeon because of lack of insurance and was therefore seeking a prescription for the pain. (Tr. 196.) Prior to this visit, Kuyper was taking 12.5 milligrams of Hydrochlorothiazide and 20 milligrams of Celexa

daily.  (Tr. 196.)  She was prescribed Amlodipine Besylate for her hypertension and Meloxicam for her knee pain.  (Tr. 196.)

On May 5, 2010, Kuyper saw Dr. Schroer and both knees were x-rayed.  (Tr. 228.)  X-rays of the left knee showed bone on bone degenerative changes along the medial joint line as well as the patellofemoral joint.  (Tr. 228.)  The right knee x-ray showed a well-implanted and cemented total knee replacement with no evidence of loosening, subsidence, or osteolysis.  (Tr. 228.)  Kuyper's left knee was injected with Marcaine and steroids.  (Tr. 228.)

On June 2, 2010, Kuyper saw Dr. Campbell complaining of back and left knee pains.  (Tr. 219.)  At that time she was taking Amlodipine (Norvasc), Hydrochlorothiazide, Tramadol, Meloxicam, and Celexa.  (Tr. 219.)  Through an exam of her back, she demonstrated limited range of motion, pain caused by the motion during the exam, and a negative straight-leg raise.  (Tr. 219.)  A bone density exam indicated normal bone mineral density and a 6.5% decrease in bone mineral density within the proximal femur since Kuyper's March 25, 2003 bone density exam.  (Tr. 220.)  These results revealed worsening or decline of bone density since Kuyper was last tested.  (Tr. 221.)

On June 4, 2010 Kuyper saw Dr. Schroer concerning problems with her left knee.  (Tr. 227.)  Despite successful Corticosteroid injections about one month prior, Kuyper was having trouble walking and standing for a period of time.  (Tr. 227.)  She was starting to fail conservative management and decided to proceed with total left knee replacement.  (Tr. 227.)  Radiographs of the left knee revealed bone on bone degenerative changes along the left medial joint line with a fair amount of degenerative changes in the patellofemoral joint.  (Tr. 227.)

Following a diagnosis of degenerative joint disease, Kuyper had a left total knee arthroplasty performed by Dr. Schroer on July 8, 2010.  (Tr. 226.)

On July 30, 2010, Kuyper was seen by Dr. Campbell for an examination three weeks after her left total knee replacement. (Tr. 225.) Dr. Campbell commented that the knee was doing "ok", and noted Kuyper was taking Vicodin routinely for pain, as the knee would stiffen and swell up. (Tr. 225.) Her incision was well-healed with some moderate swelling, but there was no evidence of any infection. (Tr. 225.) Her range of motion was 2-109 degrees with good strength, stability and terminal extension. (Tr. 225.)

On August 20, 2010 Dr. Schroer indicated Kuyper was doing "fantastic." (Tr. 224.) Dr. Schroer opined that x-rays taken of the left knee that day demonstrated a well-implanted anterior stabilized cemented total knee arthroplasty. (Tr. 224, 234.) In her physical exam, she had full active extension and flexion of 120 degrees and no varus or valgus instability. (Tr. 224.) Kuyper was to continue her home exercises and follow up in six weeks. (Tr. 224.)

On October 1, 2010, three months after left total knee arthroplasty, Kuyper's knee was doing "outstanding"; she had full active extension and flexion to 118 degrees, no varus or valgus instability. (Tr. 241.) She was told to continue home exercises and to return for a follow up in nine months. (Tr. 241.) That month, Dr. Schroer completed a residual functional capacity (RFC) questionnaire. (Tr. 240.) Under his evaluation, Kuyper could occasionally lift or carry up to 20 pounds, and could frequently carry 10 pounds. (Tr. 240.) In an 8-hour work day, Kuyper could sit and stand or walk for six hours with normal breaks. (Tr. 240.) She had no limits in her ability to push or pull, could occasionally climb ramps, stairs, ladders, ropes or scaffolds, could occasionally stoop and kneel, and had no restrictions on her ability to balance. (Tr. 240.)

Kuyper was referred to Stephen G. Smith, M.D. at the Midwest Pain Center on April 11, 2011 at the request of Dr. Campbell. (Tr. 248-49.) Kuyper complained of a constant, dull, achy pain that is belt-like, bilateral and equal in her low back and intermittent in her right buttock, hip,

groin, anterior and lateral thigh and calf. (Tr. 248.) Her pain was equal and variable throughout the day, and as a consequence, she was having trouble sleeping. (Tr. 248.) Her physical therapy helped, and the chiropractic care helped temporarily. (Tr. 248.) Kuyper's MRI showed facet arthropathy and mild central canal and bilateral lateral recess stenosis at L4-5 and mild bilateral recess stenosis at L3-4. (Tr. 249.) These findings were consistent with her history and physical exam. (Tr. 249.) She was given a transforaminal injection on the right at L4 and L5, was provided with stretching instructions, and was prescribed Elavil and Neurontin. (Tr. 249.)

Kuyper saw Dr. Canale at the Midwest Pain Center on April 28, 2011 for an evaluation of her low back, right buttock, leg, and groin pain. (Tr. 246.) Kuyper showed a 25-30% improvement after two transforaminal injections on the right at L4 and L5. (Tr. 246.) Her greatest pain remained in her right buttock and right groin, and her pain increased after standing more than five minutes, slight forward flexion, and prolonged sitting. (Tr. 246.) She was given an epidural injection on the right at L4 and L5. (Tr. 246.) Dr. Canale reviewed her stretching exercises and prescribed Vicodin. (Tr. 246.)

Kuyper saw Dr. Canale again on May 12, 2011 for an evaluation of low back, buttock and groin pain. (Tr. 244.) She improved 80% after two epidural injections at L4-5 on the right, and her function was significantly improved. (Tr. 244.) She was to continue using Elavil, Neurontin, and Vicodin. (Tr. 244.)

On May 19, 2011, Kuyper saw Dr. Canale for low back, right buttock, leg, and groin pain. (Tr. 242-43.) Kuyper reported that the pain was further aggravated with standing, walking, slight forward flexion, and prolonged sitting. (Tr. 242.) The pain decreased with Vicodin and elevating the right leg. (Tr. 242.) Dr. Canale performed a facet joint injection on the right, and had Kuyper continue her current medications. (Tr. 242.)

# IV.    LEGAL STANDARD

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The Social Security Administration uses a five-step analysis to determine whether a claimant seeking disability benefits is in fact disabled.  20 C.F.R. § 404.1520(a).  First, the claimant must not be engaged in substantial gainful activity.  *Id.*  Second, the claimant must establish that he or she has an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities.  20 C.F.R. § 404.1520(c).  Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the appendix to the applicable regulations.  20 C.F.R. § 404.1520(d).   Fourth, the claimant must establish that the impairment prevents him or her from doing past relevant work.  20 C.F.R. § 404.1520(f).  At step five, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity to perform a significant number of jobs in the national economy.  *Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000).  If the claimant satisfies all of the criteria under the five-step evaluation, the ALJ will find the claimant to be disabled.  20 C.F.R. § 404.1520(a)(4)(v).

It is the ALJ's function to resolve conflicts among opinions of various physicians and reject conclusions of any medical expert if they are inconsistent with the record as a whole.  *Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir. 1995).  Subjective complaints of a disability benefits claimant may be discounted if there are inconsistencies in the evidence as a whole.  *Guillams v. Barnhart,* 393 F.3d 798, 801 (8th Cir. 2005).

It is not the job of the district court to reweigh the evidence or review the factual record de novo. *Id*. This court reviews decisions of the ALJ to determine whether the decision is supported by substantial evidence in the record as a whole. *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir. 1994). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision. *Id.* Therefore, even if this court finds that there is a preponderance of evidence against the weight of the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. *Gwathney v. Chater,* 104 F.3d 1043, 1045 (8th Cir. 1997).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

In considering subjective complaints, the ALJ must fully consider all of the evidence presented, including the claimant's prior work record, and observations by third parties and treating examining physicians relating to such matters as:

(1) The claimant's daily activities;

(2) The subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) Any precipitating or aggravating factors;

(4) The dosage, effectiveness, and side effects of any medication; and

(5) The claimant's functional restrictions

*Polaski v. Heckler*, 725 F.2d 1320, 1322 (8th Cir. 1984). It is not enough that the record contains inconsistencies; the ALJ is required to specifically express that he or she considered all of the evidence. *Id.*

## V.     DISCUSSION

Kuyper alleges two points of error on appeal. First, she asserts that the decision of the ALJ lacks substantial evidence since it failed to point to "some" medical evidence in support of its contention that plaintiff would be capable of a sedentary RFC. Second, Kuyper contends that the decision of the ALJ failed to properly consider Kuyper's past relevant work on a function-by-function basis as required under *Pfitzner.*

**A.     Residual Functional Capacity**

Kuyper contends that the decision of the ALJ points to absolutely no medical evidence to support its determination that Kuyper retains the ability to perform sedentary work activity. Consequently, she maintains that the decision runs afoul of the standards of *Singh* and *Lauer* requiring the ALJ to point to "some" medical evidence for its findings of RFC. Specifically, Kuyper asserts that the ALJ decision failed to articulate how the medical evidence and daily activities reasonably led to its conclusion. Instead, Kuyper alleges the ALJ merely outlined the medical evidence and her daily activities and concluded she was capable of performing work eight hours each day, five days each week. Moreover, Kuyper highlights medical evidence of record that supports her claims of inability to perform a sedentary job.

The most important issue in a disability determination is the issue of RFC which assesses the ability to perform the requisite physical acts daily in the "sometimes competitive and stressful conditions in which real people work in the real world." *Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir. 1989); *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982). *See also, Ross v. Apfel,* 218 F.3d 844, 849 (8th Cir. 2000) (RFC is an assessment of an individual's ability to perform sustained work-related physical activities in a work setting for eight hours a day, five days a week.). The RFC is a medical determination that must be supported by some medical evidence. *Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000); *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). A claimant "need not prove that her pain precludes all productive activity and confines her life to in front of the television." *Baumgarten v. Charter*, 75 F.3d 366, 369 (8th Cir. 1996). *See also, Burress v. Apfel,* 141 F.3d 875, 881 (8th Cir. 1998) (noting that a claimant's ability to perform light housework or visit with friends would not support a determination that the claimant could engage in full-time, competitive employment.).

Here, the ALJ's decision is not supported by evidence on the record as a whole. The ALJ failed to articulate a rationale in support of its finding that Kuyper was capable of a sedentary RFC. While the ALJ decision does make mention of the RFC questionnaire completed by Kuyper's surgeon, this RFC questionnaire was completed approximately three months following total left knee replacement surgery. The ALJ provides no explanation as to why Kuyper's more recent medical evidence, which is more recent than the surgeon's RFC questionnaire, fails to suggest any work-related limitations. The decision merely highlights her recent treatments and concludes they do not suggest any limitations beyond those indicated in the RFC questionnaire completed several months before. In fact, recent medical evidence suggests that Kuyper's condition may have worsened since the RFC was completed. She has presented with constant,

dull, achy pain that increases after standing more than five minutes or sitting for a prolonged period of time. She also has difficulty sleeping because of the pain. Injections have only temporarily relieved Kuyper's pain before it returns without incident. Finally, while she is able to manage the pain with prescription drugs, the side effects of these medications cause Kuyper to become too drowsy to function in a work environment. Therefore, medical evidence does suggest limitations greater than those set forth in the RFC determination.

Kuyper further submits there is no rationale as to why Plaintiff's ability to perform basic house work including laundry, ironing, driving the car, shopping, watching television, and crocheting would be inconsistent with the findings of disabling buttock, back and knee pain. Where adequately explained and supported, credibility findings are for the ALJ to make. *Lowe v. Apfel,* 226 F.3d 969, 972 (8th Cir. 2000) (citing *Tang v. Apfel,* 205 F.3d 1084, 1087 (8th Cir. 2000)); *McKinney v. Apfel,* 229 F.3d 860, 864 (8th Cir. 2000). Subjective complaints may only be discounted if there are inconsistencies in the record as a whole. *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984). There, an ALJ must make an express credibility determination explaining the reasons for discrediting the complaints. *See Ghant v. Bowen,* 930 F.2d at 637; *Singh,* 222 F.3d at 452; *Lowe,* 226 F.3d at 971. An ALJ may not discount allegations of disabling pain solely on the lack of objective medical evidence, but a lack of objective medical evidence is a factor an ALJ may consider in determining a claimant's credibility. *See Forte v. Barnhart,* 377 F.3d 892, 895 (8th Cir. 2004) (citing *Tennant v. Apfel,* 224 F.3d 869, 871 (8th Cir. 2000)). "[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking are inconsistent with subjective complaints of disabling pain." *Medhaug v. Astrue,* 578 F.3d 805, 817 (8th Cir. 2009). The issue is not whether the claimant actually experiences the subjective complaints alleged, but whether those symptoms are credible to the extent that

they prevent her from performing substantial gainful activity. *Baker v. Apfel,* 159 F.3d 1140, 1145 (8th Cir. 1998); *Black v. Apfel,* 143 F.3d 383, 386 (8th Cir. 1998).

Here, the ALJ failed to fully explain why Kuyper's subjective complaints lacked credibility. The ALJ contends that evidence does not support more restrictive limitations than those set out within the RFC; however the RFC fails to consider recent medical evidence suggesting Kuyper's condition has worsened. Moreover the RFC is inconsistent with medical evidence on the record, particularly evidence of Kuyper's treating physician, Dr. Campbell. While the ALJ asserts that Kuyper's daily living activities are inconsistent with her alleged degree of limitation and in fact support the capacity to perform at least sedentary work activity, Kuyper "need not prove that her pain precludes all productive activity and confines her to a life to in front of the television." *Baumgarten,* 75 F.3d at 369. Kuyper did indicate that she performs daily living activities; however she also asserted that her ability to perform these activities was severely limited. Few of her daily activities are successfully performed without Kuyper needing a break every ten minutes. Moreover, medical evidence is consistent with Kuyper's subjective complaints of pain.

The ALJ also failed to sufficiently address the factors that favor Kuyper's credibility. The ALJ does not mention that Kuyper has been compliant with her treatment and medications. The ALJ noted that Kuyper had a consistent work history between 1990 and 2005, but stated that "other factors outweighed consideration of [Kuyper's] work record in determining the credibility of her allegations." (Tr. 15.) Kuyper also had earnings through 2008. (Tr. 97.) "[A] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Nunn v. Heckler*, 732 F2d 645, 648 (8th Cir. 1984.) Upon careful consideration of the record, the Court cannot say that it "weighs so heavily against [Kuyper's]

credibility" that the ALJ would have discounted her credibility absent his failure to consider Kuyper's most recent medical records and failure to consider evidence in light of all of the *Polaski* factors. *See Ford v. Astrue*, 518 F.3d 979, 983 (8th Cir. 2008) (reversal and remand warranted where ALJ made erroneous inferences regarding claimant's credibility). Therefore, the credibility determination was not supported by substantial evidence on the record as a whole. Accordingly, the Court will remand this action to the Social Security Administration for reconsideration of Kuyper's residual functional capacity and credibility.

**B.     Consideration of Kuyper's Past Relevant Work**

Kuyper next submits that the ALJ's analysis of her past relevant work contained in the decision runs afoul of the standards set forth in *Pfitzner*. Specifically, Kuyper contends that the decision fails to compare, on a function-by-function basis, her physical and mental residual capacities and the job requirements of her past relevant work. Kuyper asserts that the ALJ made no explicit findings as to the mental demands of her past work.

The ALJ has an obligation to "*fully* investigate and make *explicit* findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before he determines that she is able to perform her past relevant work." *Groeper v. Sullivan*, 932 F.2d 1234, 1238 (8th Cir. 1991) (quoting *Nimick v. Secretary of Health and Human Servs.*, 887 F.2d 864, 866 (8th Cir. 1989)). Failure to fulfill this obligation requires reversal. *Kirby v. Sullivan*, 923 F.2d 1323, 1327 (8th Cir. 1991). A mere conclusory statement that the claimant retains the RFC to perform a wide range of work is insufficient. *Pfitzner v. Apfel*, 169 F.3d 566, 568 (8th Cir. 1999). Findings that a claimant retains a RFC to perform her past relevant work experience, as she described it, and as such work is normally performed in the national economy are simply insufficient. *Ingram v. Chater*, 107

F.3d 598, 604 (8th Cir. 1997). "The ALJ must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's residual functional capacity." *Pfitzner,* 169 F.3d at 568 (quoting *Groeper,* 932 F.2d at 1238-39).

The ALJ's decision is completely lacking in any real analysis of Kuyper's ability to return to her past relevant work. The ALJ's analysis regarding Kuyper's past relevant work states:

> The claimant is capable of performing past relevant work as a financial aid assistant. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity . At the hearing the claimant described this as a desk job. On a work report dated August 24, 2010, (Exhibit 9E, p. 1) the claimant said that in this work she provided assistance to a financial aid coordinator and performed general clerical duties. Such duties, would not be precluded for an individual with functional limitations as set forth above in Finding 5. In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed.

(Tr. 15-16.) The ALJ determined that Kuyper could perform the full range of sedentary work. (Tr. 12.)

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

The Court has previously stated that the ALJ's decision discounting Kuyper's credibility lacked substantial evidence. The following analysis gives credit to Kuyper's testimony and the

medical evidence in the record as stated above. In consideration of the foregoing, there are several issues with the ALJ's determination that Kuyper could return to her job as a financial aid assistant. First, Kuyper testified that she was fired from that job after six months, because she lacked experience to complete her job duties. (Tr. 29-30, 56.) Although Kuyper testified that she sat most of the day doing that job, Kuyper also testified that since her surgery she had to move and stretch and would be sitting too much to be able to perform the job. (Tr. 30.) The ALJ did not make any explicit findings on the record that the financial aid assistant job would allow Kuyper to sit and stand as needed. The ALJ also failed to consider that the VE testified that he was unaware of any jobs that would accommodate Kuyper's work restrictions (two knee replacements, needs to move about from sitting to standing throughout the day because of pain, missing ten minutes for every hour of actual work) given her age. (Tr. 54.) It should also be noted that the ALJ and VE considered Kuyper's job as similar to an administrative assistant's job, which the VE stated was in high demand. (Tr. 54-55.) The VE also summarily dismissed Kuyper's assertion that she has tried and failed to obtain administrative assistant jobs, because she could not type fast enough by stating that Kuyper had "some issues," but that "doesn't means she couldn't learn to type." (Tr. 56.)

The ALJ may refer to the job descriptions in the *Dictionary of Occupational Titles,* for a definition of Kuyper's job as it is performed in the national economy. *Sells v. Shalala*, 48 F.3d 1044, 1047 (8th Cir. 1995). In this case, the ALJ failed to demonstrate how the RFC was consistent with the physical and mental demands of her past relevant work. The ALJ made a conclusory statement that "[c]omparing [Kuyper's] residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant was able to perform it as it was generally performed." (Tr. 16.) Neither the VE or the ALJ referenced the DOT

regarding Kuyper's past relevant work; therefore, the ALJ's decision could not have relied upon the DOT in determining that Kuyper could perform her past relevant work as a financial aid assistant. Kuyper's description of her past relevant work included that it was a desk job, she reviewed check requests and gave them to her boss noting if the amounts were correct; assisted the financial aid coordinator; copied things; assembled boxes, and performed general clerical duties. (Tr. 28-30, 190.) This evidence is not substantial evidence that Kuyper could return to her past relevant work, because there is no evidence in the record that Kuyper's past relevant work accounted for her need to alternate sitting and standing, but there is evidence that she needed the accommodation and there may not be any jobs that would accommodate her work restrictions. Therefore, the ALJ's conclusory analysis failed to include the details necessary to determine the physical and mental demands of Kuyper's past relevant work, the Court will reverse and remand this matter for consideration consistent with this opinion.

## VI.  CONCLUSION

The undersigned finds that the ALJ's decision is not supported by substantial evidence on the record as a whole. Therefore, the ALJ's decision should be remanded for further consideration consistent with this opinion.

Accordingly,

**IT IS HEREBY ORDERED** that the relief which Kuyper seeks in her Complaint and Brief in Support of Complaint is **GRANTED**. [Docs. 1, 17]

**IT IS FURTHER ORDERED** that the ALJ's decision of June 17, 2011 is **REVERSED** and **REMANDED**.

**IT IS FURTHER ORDERED** that a Judgment of Reversal and Remand will be filed contemporaneously with this Memorandum and Order remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. § 405(g), sentence 4.

Dated this 28th day of March, 2013.

    /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE